We'll turn now to DHIP, LLC v. Fifth Third Bank Mr. Reifman. Good afternoon, Your Honors. May it please the court, Joshua Reifman from The District Court in this case erred by finding that DHIP does not exist for purposes of suing or being sued and that it therefore could not maintain this action and therefore dismiss the action. The District Court applied the 2016 Pennsylvania LLC statute, which is the Pennsylvania Uniform LLC statute, to a dissolution filing that was made in 2014. And even in doing so, even if the 2016 statute is the relevant one, the court applied it incorrectly. The correct statute, which I believe our briefing has set forth, is the previous LLC statute, which is the LLC statute of 1994, which was in effect until April 1, 2017. That statute, sections 8976 and 8977, and that full site is 15 Pennsylvania CSA 8976 and 87, says instead that upon the filing of a certificate of dissolution, the company ceases to exist, quote, except for purposes of prosecuting and defending legal actions, other proceedings, and appropriate action as provided in the statute. Was any legal action pending when the certificate of dissolution was filed? No, Your Honor. It was not. Do you believe there's any limit on the amount of time that can pass between dissolution and purporting to file a new legal action on behalf of a dissolved corporation? Yes, Your Honor. It's directly in the statute. The cause of action by the company may be asserted until the statute of limitations expires on such a claim. So running from, so without regard to when that was actually dissolved and whether any action was pending and whether it was listed as an asset anywhere or acknowledged as a matter that was preserved when dissolution occurred. Is that right? I think that is correct. And that's section 8977, which says that the dissolution of the LLC shall not eliminate or impair any remedy available to or against the company or its managers or members for any right or claim existing incurred prior to dissolution. So the claim must exist, but it does not have to have been asserted if an action thereon is brought on behalf of the company within the time otherwise limited by law. And do you call these clauses to the attention of the district court? The district court didn't mention this clause in either of the statutes. I mean, I guess there were a series of statutes that were replaced over time except for the purpose of legal actions. Was that brought to the attention of the district court, Judge? The district court applied the 2016 statute, I believe at the behest of Fifth Third Bank. What I was arguing to the district court was primarily the... So the answer is no, you did not bring this to the attention of the district court? I don't believe so, Your Honor, because I was arguing about the statement of correction, which I believed was a separate and independent ground why the company should be able to assert its claim. Because after filing the statement of correction, the Pennsylvania Commonwealth Department of State said that it restored DHIP to active status and showed that. And DHIP has since then paid the annual or biannual filing fees to that end. That was the result of a conversation you had with an employee in the department. Is that right? But your position was that the statement of correction was sufficient to revive the corporation? Yes. Well, it's not quite revival. I don't think that's the proper way to phrase it. It had been dissolved, correct? Yes. But I believe that the effect of that statute provides that the mistaken filing is void ab initio. And it's not stricken from the record, but it is of no effect. So it is restored, I believe, as of the date that the erroneous filing was made. And the filing was erroneous because this very valuable claim existed. Well, it was voluntarily filed and dissolved nonetheless, wasn't it? I'm sorry, Your Honor? The corporation, the certificate of dissolution was filed voluntarily. Yes. Yes, that's a decision that its owner center made. So on the second question, can you point to any provision of Pennsylvania statutory law in support of your argument that a dissolved LLC can be transferred? There is no provision that it cannot be transferred. I ask the reverse. I'm getting to that, Your Honor. I'm sorry. Both the 1994 statute and the 2016 statute have broad language that says and take any such action as may be necessary on behalf of and in the name of such dissolved company. Also, the entity which is doing the transferring is not the dissolved company. It is the owner of the dissolved company, which was Center Asset Management and later Mr. Abate. Is there language in either statute that says that a not dissolved LLC can or can't be transferred? No, I don't believe there is such. It's implicit in business organizations, broadly. Right. And Pennsylvania law requires that statutes be interpreted liberally, except in very particular circumstances. If I can follow up on Judge Carney's line of inquiry, can you identify the statute that governs Drexel Hamilton's existence here? As far as I can see, there are two that come to mind, but you may have others. Sure. One is 15 Pennsylvania consolidated statutes, 8976. That is. Another one is 15 Pennsylvania consolidated statutes, 188872. They both do, Your Honor, but at different points in time. Until April 1st, 2017, the 15 Pennsylvania CSA 8901 at SAC governed. And as of April 1st, 2017, the other statute, which is, as you point out, 8800. 15 Pennsylvania CSA 8871 at SAC. And your view is that under either statutory scheme, one can buy a membership interest in a dissolved company? That is correct. Is it any dissolved company or is it a dissolved company that's still in the wind-up period that hasn't actually terminated? It's a dissolved company that's still in the wind-up period. And under the 2016 statute, when that is done, the company must then file a certificate of termination saying this is now terminated and all assets and claims have been distributed and all reserves have been made for any claims. And am I right in understanding that under the prior version of this statute, there was the dissolution which starts the wind-up period and reduces greatly the universe of activities available to the LLC? But there's not actually a comparable termination filing that then signifies formally that the wind-up period is done. That is correct. And I think the district court erred when it, I think it conflated the certificate of termination with the certificate of dissolution. That's on page 12, I believe. There wasn't a certificate of termination under the old. I suppose for purposes of legal rights, you know that you're done because the statute, two years has passed vis-a-vis claims against you and the statute of limitations on any claims you might have have run? Is that, and then you're done as a matter of law? I think once you've distributed all the assets, made reserves for any claims against it, and the statute of limitations has expired on claims for and against the company, then it would be done, but there's no comparable certificate of termination, Your Honor. Okay. Let me try to ask a question on this issue of winding up. What's the evidence in the record that Drexel Hamilton was still winding up? Let's take year by year, 2015, 2016, 2017, 2018. Can you point to the evidence in the record that would illuminate whether Drexel Hamilton was still winding up? Well, Your Honor, in each of those years, what Drexel Hamilton had was this claim, this unasserted contingent claim, possibly of great value, maybe not, depending on what happens. But what's the evidence? But there's no other activity because it can't- What's the evidence of the winding up? Is there any other activity other than this inchoate interest that you refer to? No, Your Honor, because that's all the company has to be, that's all the company is allowed to do to assert it can't do business until Mr. Abate then files the statement of correction. And then I think that filing, which was erroneous because this inchoate claim existed, it's void ab initio, and it then becomes- But there's no evidence beyond that one, I believe, inescapable fact. Let me ask you about Mr. Abate's statement of correction. It sought to undo or to rescind the dissolution, right? That's correct. And it's your view that the law prohibits this and only allows for the correction of documents, is that right? What it does is that it says whenever a document has been filed inaccurately, you can file this statement of correction. This is 15 Pennsylvania CSA Section 138. The portion of the document requiring correction in corrected form, or if the document was erroneously executed, a statement that the original document shall be re-executed or stricken from the records of the department, as the case may be, and the corrected document shall be effective, and this is one little Roman too, as of the date the original document was effective as to all other persons. But to understand your position, your position as I understand it, is that the law prohibits what Mr. Abate's statement of correction sought to do. Or the opposite, I guess. No, Your Honor, I don't mean to say that. What I mean is I'm just making a distinction between reviving. I just don't think reviving is the proper word. But it absolutely undid. It made void ab initio, or non pro tonque, the original filing as of the date of the erroneous filing. Okay, thank you very much. Thank you, Your Honors. We'll hear from Mr. Lindstrom. Thank you, Your Honors. Aaron Lindstrom on behalf of Fifth Third. I'd like to start with Judge Robinson, your question about whether there's anything in the Pennsylvania Code that allowed an active LLC to be transferred. And the answer to that is yes. If you look at the 1994 Act, in section 8923, that shows transfers of property. And 8924 talks about transfers of membership interests. So the 1994 Act did expressly provide a way to transfer an active LLC. So the Pennsylvania legislature knew how to provide for the option of transferring something. And it did not do that in the dissolution sections. In the dissolution section, under the 1994 Act, was 8976. That specifically talks about it exists, it shall cease, except for the purpose of litigation and other proceedings. Okay, but the except for modifies the shall cease, so it isn't fully ceased. Correct. There is a kernel of something there that has some legal rights and obligations for a period of time. Correct. And that's why we don't fully agree with the district court. We do agree it exists. But it doesn't, it exists and Center owned it. And Center couldn't transfer it, which is the point. On your view of the law, if you've got a LLC, let's say it's family owned. And the, let's say there's three members and they dissolve. Haven't completed responding to or affirmatively litigating rights and remedies pursuant to 8977. But it's otherwise in the same state. And the three members die. Do the rights both against and by the LLC evaporate? Or are the membership interests in that entity something that can be transferred to their heirs? So I would expect they could be transferred to their heirs. But that would be an operation of a different set of laws. Not by the laws that allow general transfers. But that's a specific operation of the laws that govern intestacy or wills and things like that. Well, but the intestacy wills tells us who it goes to, right? There's nothing going to be in the laws of intestacy that describe a post-dissolution winding up LLC in any sort of specificity. The question is whether there is a thing that can be, take it out of the will context. They're terminally ill and they need to get somebody else, get it to somebody else to move it on. Can they pass it by inter vivo's trust? I think the only thing they could pass would be the ability.  I mean, I think- So if the people who happen to be the member owners at the time of dissolution, for whatever reason, seek to divest themselves of that responsibility and opportunity, and someone else wants it, that feels like a unique notion in business organizations law, that there's something that just evaporates rather than belongs to someone until it's actually terminated. So I guess part of what I'm struggling with is the intent of the statute is it shall cease to exist except for litigation purposes. So it's talking about the entity existing, not about the separate interests existing. And the entity no longer exists under that language. And so the entity- Well, the entity does exist. It doesn't exist except for certain purposes. So it does exist for those purposes, right? It exists for that purpose, I agree with that. Right. So there is an existing entity. It's for a very limited universe of purposes, but it exists. Right. And it doesn't exist to be transferred to other entities. That's not part of what dissolution or winding up is about, I would think, in that instance. In fact, one of the other points that the district court made that is in line with this point is that he was unaware of any place in the Pennsylvania Code that allows for reviving an LLC after it's been dissolved, so in an instance where there's no kind of way to bring it back to life after that's happened. I wondered, so did you make the argument about transfer before the district court? We did not make that argument, and we think we're free to raise it here because it goes to standing. Okay. So you wouldn't treat it as waived. You think it goes to actual Article III standing? I think it does, Your Honor. In the cases we cited, the First Circuit decision in Riel-San Juan Hotel, the Benjamin case from the Third Circuit, we think it does because, for example, if I was a stranger at some corporation, I couldn't just go sue on behalf of Pepsi if I owned no stock in them. I just don't have the authority. There's no controversy there when there's no plaintiff that authorized it. So on a different question, the 2018 Statement of Correction states, as I understand it, that the September 2014 certificate of dissolution shall be deemed stricken from the record, and there seems to have been an employee within the Connecticut state government that permitted that and made appropriate changes to the Pennsylvania state records. Why doesn't that bind us and aren't we bound to treat that as reviving or acknowledging a continued existence of DHIP? We think it doesn't bind you because of the transfer issue. The transfer reportedly happened at a point in time in the attempt of Abate. When we say he didn't actually own anything, his attempt to revive it or correct had no legal effect because he was already at that point in time still, I should say instead of already, he was still a stranger. He had no ownership interest. So that's the transfer point, I think, answers that question. So it's a sequencing issue. I think so. I think the timing does matter. Okay, thank you. Now, your standing argument, which you adverted, did you preserve that argument? Your opposing counsel contends that you did not. This is a separate aspect of it. We raised a different standing argument. But standing, as we explained in our brief on page 15, citing decisions from this case, this court, the Lindenville case, standing is something you can raise at any time. As the U.S. Supreme Court explained in Luan, it's an irreducible minimum of Article III subject matter jurisdiction. So standing is something that we can raise at any time. And am I right? I'm sort of inferring, and I understand why you wouldn't come out and shout it from the rooftops. But I'm sort of, I am inferring that you're not embracing the actual reasoning that the district court used in this case. You're not denying that under the statute in effect in 2014, the ability to pursue litigation was within the universe of opportunities and That's right, Your Honor. We think Senter, who owned the entity, could have brought the lawsuit. It did exist. Senter existed for the purpose of litigation. But transferring it to a third party, which, again, I think is kind of different from the family law or the examples you raised, this is one business entity transferring it to other business corporations. Well, it's kind of family-ish, right? I mean, part of what's going on here is they're trying to align the ownership of what remains of the entity with the people whose rights were actually allegedly infringed so that they can pursue the claim rather than let it die. But it was the entity that had the rights, not individuals. We know that from the district court's decision in the individual case where it recognized that they were derivative claims. And so they didn't have any actual interest in them. Because they had given up their membership interest. They had no membership interest, which is why they had to try to buy it later, try to get it back, right? But once the entity has been dissolved, there is no provision in Chapter 89 of the 1994 Act or anything in the 2016 Act that allows it to be transferred. And I think, again, this is to express Eunice's point. I've given you examples in the 1994 Act where the legislature showed how to talk about transfer. It didn't include transfer when it was talking about dissolved ones. Well, it didn't talk about transfer when it was talking about the powers of this entity, the diminished entity that remains. But as your colleague points out, it's not the entity that's transferring anything. It's the owners of the entity that are transferring their interests, which happen to be the entity. I mean, it's a weird, it's not a power of an LLC to transfer itself. It's a power of the members who have interest in the LLC to transfer their interest. But they had no interest at the time it was dissolved. It was dissolved in 2014. No, no, but the company, the center did. The center had an interest that it, and you're saying it's an interest that they couldn't convey. I'm saying it couldn't convey to them any more than it could have conveyed to some other third party. Sure. And I think this case is also, I talked about the 1994 Act. I think the express convenience point is even stronger than the 2016 Act. Because if you look at Section 8872B22, that talks about what you're allowed to do in winding up. And it specifically covers litigation and proceedings. But the very next sentence is about transfer of the company's property. So, again, the legislature shows it now has to talk about transfer, this time in the specific context of a dissolved entity. Transferring of the company's property is a very distinct concept from people who own the company transferring the company. Exactly. And that shows that the legislature didn't choose to include that very different concept as one of the things you could do in winding up. But it wouldn't have belonged in that section. I mean, maybe they could have had some other section. But you wouldn't include the owner's rights when you're talking about the entity's abilities in Subsection B there. Well, if not there, then I'm not sure where. And they haven't identified any place in the 2016 Act that affirmatively provides this ability to do it. And the statute talks about whether, I mean, this is just, one of the later sections talks about whether it's something necessarily appropriate to do with a dissolved entity. And it seems like it's not appropriate to transfer a dissolved entity that exists only for the purpose of litigation to an entirely different person instead of winding it up. Could the dissolved entity, instead of the owners transferring the dissolved entity, could it have essentially assigned any rights that it had against Fifth Third to perhaps in exchange for consideration, which then gets distributed to the members? Would that have been an effective way to accomplish what they're trying to do? I think that might have. And they've expressly disclaimed that that happened. They've expressly said in the Certificate of Dissolution that they filed in 2004 that, actually it says it in this brief. They say in their brief that they did not transfer, let me go back and find the page. I hear this. I just wonder whether your thought was that that would have worked. Right, so that potentially could have worked. They've expressly disclaimed any assignment here and specifically said that they did not. If I can ask one other question. I understand you to argue on appeal that the Revised Uniform Limited Liability Act that was enacted in 2016 in Pennsylvania does not apply retroactively to DHIP. Is that right? I think right. We think with dissolved entities, for entities that have already been dissolved, it wouldn't have applied retroactively. But the act itself provides that it became retroactive to all prior LLCs, I think, as of April 2017. So you're saying it doesn't apply as to entities that were dissolved. Is that right? That's where I think is the better reading because I don't think it applied to entities that had been dissolved decades ago, for example, or things like that. I don't think it matters because we have the same express unius point under both statutes, under 1994 and 2016. Under either one, the only thing, there's a specific set of things that the Pennsylvania legislature allowed dissolved entities to do. Litigation is one of them. Transfer is not. Thank you. I guess we'll rely on the brief on the choice of law alternative. Thank you, Your Honors. Mr. Reed. Thank you, Your Honors. I just have a couple of points. There was an exchange between Mr. Lindstrom and Judge Robinson about, I think Mr. Lindstrom said that the filing of the certificate of correction is void. If the transfer is void, only Senter could have filed it. Well, had it not been transferred, the record is very clear that Mr. Abate is something like a 24% owner of Senter. It's Mr. Abate who filed the certificate of dissolution in the first place back in 2014 on behalf of Senter. So I don't think that that is a Is it your position that the notice of correction or whatever it was called was filed on behalf of Senter and that he was acting as Senter? No. No, Your Honor. No, that was filed by Mr. Abate. I'm simply responding to the argument that that filing itself was illegal as the But do you disagree with his point that if the transfer from Senter back to Mr. Abate wasn't a legally recognized transfer, that the attempt to then file the correction would have been null because he didn't actually have an interest to go ahead and do that? Legally, I believe you're right, but practically it could have been accomplished by Senter. That was my only point to that. Again, there is nothing in the statute, whether it's in the rights of the dissolved company section or elsewhere, that prohibits the transfer, assignment, sale of the membership units. And I think it's very dangerous public policy to say that the Pennsylvania legislature only authorized corporate entities to do expressly what they've said in the statute. And I think it runs contrary to the rule of strict and liberal construction in one Pennsylvania CSA 1928, which is cited in our brief, which says that except for things like penal and retroactive provisions and those imposing taxes in eminent domain, all other provisions of a statute shall be liberally construed to affect their objects and to promote justice. And it would not be a promotion of justice. And so I don't think that's what the Pennsylvania legislature intended. Thank you very much. Thank you, Your Honors. And we'll turn to the next case on our calendar, IAN versus Farfetch. Ms. Ormsby. Good afternoon, Your Honors. Lauren Ormsby from Bernstein-Litowitz on behalf of plaintiffs. Under NOVA review of the securities fraud complaint, this court should reverse the dismissal of both the Exchange Act and Securities Act claims. Starting with the Exchange Act, it was reversible error for the district court to address only the IPO statements and not even acknowledge, let alone assess the affirmative misrepresentations made surrounding and starting the day after the IPO through June 2019. Those are statements and allegations concerning over 300 days of a 322-day class period. And not only were those statements materially misleading to a reasonable investor, but those statements and allegations from the post-IPO timeframe provide critical, scienter allegations that the district court was required to have viewed holistically and without superimposing its own benign reading of the fraud, and that's reinforced most recently by this court's decisions in Haines-Celestial and Textron last year. There's three narrow buckets of misstatements throughout the class period that are involved in this appeal. First, statements concerning FARFETCH's existing first-party business. And those statements include statements that we do not buy any products. We are not a retailer. We don't own the inventory. And over 95% of our revenue comes from the marketplace. The second bucket of statements are related, and those are the statements that the company had no even preliminary plans for acquisitions and that later in the class period the company's statements that their first-party business was reducing and will continue to reduce. And the third bucket of statements are that FARFETCH engaged in only periodic promotions and sales as opposed to the constant promotions initiated pre-IPO to drum up sales, and that was a fact that was purposely hidden from investors. So the court's decision... Why is that latter action particularly relevant? The periodic promotions statements? Because FARFETCH, first of all, makes its money from commissions. So you have the products that are sold, and they advertise as taking 30% of those. These promotions that we allege with credible allegations of a former employee started before the IPO, so this is a current present misstatement. Those promotions of 20%, 30%, or dollar value, those were taken out from their commissions. So these impacted their revenue, but they did not tell investors that they were doing this onslaught of current promotions to drum up sales, and then in their financial statements devised a kind of a KPI, key performance indicator, where they mixed promotional costs with their fulfillment revenue, so all the money they got from shipping. So there's no way for investors to do their homework and try to figure out how much of these are their constant promotions as opposed to periodic, and if there are, how are they really impacting the company's sales and how they're doing, how vibrant this marketplace really is. How do we deal with, with respect to that cluster of alleged misrepresentations, how do we deal with the fact that right at the beginning of the offering document, when it defines the terms it's using and it defines this key indicator, it makes it clear that that's not included, that the promotions are accounted for in this other bucket, and I mean that's sort of there on the table from the outset. I understand your point that it doesn't tell us the amount of that. Right, I think investors- Weren't they transparent from the get-go that that's what they were doing? I don't think it was clear from the get-go at all. I think, first of all, the fact that they said we might increase promotions in the future was false and not consistent with their statement that they were periodic at the present, but also telling investors, okay, we're not going to tell you what our promotions are impacting our commissions. We're going to mix them with this other bucket. Fine, they told investors that, but investors can't actually deduce what that means, right, because you have positive shipping dollars negating some of those costs of promotions. If they had just said, here's the cost of our promotions, and people could tell, oh, they're losing $20 million a quarter through these promotions, that's a fact that would have informed investors. But the way they reported them, and they did have, it wasn't just shipping, but all their fulfillment costs, it was still a net positive. So it was hard, they were still, you know, that number, the combined fulfillment and periodic or the constant promotions, was a positive because they did, you know, not outweigh each other. So it really left investors in the dark, respectfully. As to the statements in the first bucket where you point to statements by management that they are a platform and not a first-party retailer, those were all made, as I understand it, well after their acquisition of Browns, which is a first-party retailer. And so they had both, you know, Browns is online, an actual store, but it seems to me that that was well known and was, you know, part of the profile presented to the public. So the broad statements that we're a platform or a third-party retailer were, you know, can only be understood in that context as not being literally true. I'm glad you brought that up, Your Honor, because the Browns acquisition, we actually allege, was, you know, used to actually mislead investors. The Browns acquisition was in 2015, so long before the IPO, for $10 million. It was a small boutique store in London. The Bugard's acquisition was, you know, 70 times that for $700 million. And defendants, we have everyone who told us from direct conversations tried to downplay Browns, but they also told investors, oh, Browns was a surgical tool. We're just using this as a way to test out the marketplace, but our marketplace is first-party. And also, when they make those statements, we are not a retailer, we don't buy inventory, the fact that they had a small acquisition of Browns and that they tried to detract from investors any knowledge that Browns was anything more than an aberration from their core business model of having a marketplace, investors aren't required to go back and do all of their homework. Nonetheless, doesn't it demonstrate still those were not statements that are meant to be absolute and categorical descriptions of what they are doing because they clearly were not? I think there's two ways to look at that, Your Honor. One, I think at the very least they're misleading because they're giving the representation and the indication to investors that they're moving forward just as a marketplace. If you say we are not a retailer, we don't buy products, even if an investor, a savvy investor, says, oh, wait, they do have a small part of that, it indicates to investors, but going forward, that's not their goal. Going forward, they're focused on being a marketplace, where at the same time they're saying these statements, they're in due diligence to buy New Guards. They're fully in due diligence to buy the $700 million first-party retailer. The other part of that is, as Judge Broderick recently found in the Goldman 1 MBD, you can't have, you know, do we have a world where you get to make actually, ridiculously as our colleagues stated in their briefs, false statements, as long as investors do their homework, right, and look back and test if they're really false. It's not a homework exam. If you say we don't own inventory, if you're saying that as late as April 2019, we don't buy products, is a reasonable investor honestly supposed to have to go back and do their homework? Well, the homework is really not so onerous. I mean, yes, the offering documents are voluminous, but with regard to future plans and forward-looking representations and so on, you know, we have a few paragraphs. And they clearly reserve the right to make acquisitions of different kinds. And, you know, we already have a variegated portfolio, kind of a business model. So it's not really clear to me that it's such an onerous obligation to hold investors to looking at the materials they're provided. I don't know how onerous it is, Your Honor, but I think a reasonable investor impacted the total mix of information because there's a misleading nature to the fact if you are hammering home to investors that you are a marketplace, that is your future, you have no plans to increase any first-party sales, and then make these blatantly false statements without any cautionary language, it's misleading to an investor about your future plans at the very least. Do you think they had to disclose that there were specific considerations or targets under consideration for acquisition? I don't think they had to disclose that they were in due diligence and had a specific target for acquisition. But it's not an omissions case. They're telling investors we don't have any plans for acquisitions. And later in February, they're telling investors first party is going down to 5%. You don't make these actual affirmative misrepresentations of where the company is going when your actual plans are the opposite. But what is the timeframe that it's appropriate to look at? I mean, this seems to me still consistent with the notion that in the long run, and some of those allegations, the statements that you pointed to said in the long term, we're going to look at first party being 5%, 10%, what have you. So the fact that that didn't happen right away in 2018, 2019, that doesn't necessarily render those statements false, does it? I think it does, Your Honor. I think at the very least, especially when we know concretely that the due diligence, it wasn't talks, it wasn't thoughts, it was actual plans for the acquisition to spend all of their IPO proceeds on a first party retailer. Defendants perhaps did not have to say, hey, we're going to go acquire new guards and use all of our IPO proceeds. It was $675 of a billion, right? $675 million. It was a billion dollar offering, but what the company got out of that after underwriters fees and all of that was closer to $675 million. But they were required not to make affirmative misrepresentations about where the company was going when they knew the opposite. If we can go, if, oh, actually, I reserve time. Thank you, Your Honor. We'll make sure we'll give that extra time as well. Good afternoon, Your Honors, and may it please the court. Farfetch made no false statements in the offering materials or afterwards, and it certainly didn't do so with Sienter. Judge Nathan rightly dismissed the complaint here. Plaintiff's court claim, as we just heard, is that Farfetch told investors it was running an exclusively third party business at the same time that it was actually radically shifting strategy to a first party strategy. But the record materials make clear that there was no such change to the core strategy. Both before and after the IPO and before and after the new guards transaction, and Farfetch revenues continued to predominantly come from third party sales. Even though the company acknowledged throughout the entire process and was transparent that first party retail was important, even though it was smaller than the third party sales, it was still an important part of the strategy. Farfetch was transparent with investors about the role of the first party business at all relevant times. But still, I was just struck by the size of the acquisition of new guards. I mean, Browns was small. It was $10 million. And new guards, we were talking $675 million, almost all of the proceeds that came to Farfetch from the IPO. And that was really at odds with their general descriptions, repeated descriptions about the nature of their business, and even acknowledging that there's a short-term, long-term discrepancy potentially. But, you know, why was it okay not to disclose more prominently that it would be important for the third party business to make some first party acquisitions potentially, or just to give some clear signal to investors that they might get into a situation where they'd be taking risks involving inventory and so on that some investors in the market have not recognized they were taking. Right. So a couple of points on that, Your Honor. First of all, with respect to the new guards acquisition, I think it's important to keep in mind the timeline. The allegation is made that the due diligence on new guards began, I think it was in February of 2019. And the bulk of the statements that are at issue here are in the offering materials. There's conspicuously no assertion, no allegation, that new guards specifically was on the table at the time of the IPO. And I think it's especially conspicuous the absence of that allegation, given that the other side has someone that they say was an insider in the company who actually ended up working on the new guards acquisition. And even that person didn't say new guards specifically was under consideration. But I think there were statements also in May of 2019, right before the August acquisition of new guards, just public statements, I don't know whether it was an earnings call kind of situation or to the media that no, you know, our business is, we're a platform. Right. We're not inventory banks. And I think the company was talking about its general strategy, and that was still true even after the new guards acquisition. Although it's true that buying new guards for a substantial sum of money, it was not all the cash. It was part cash, part stock. But either way, it was a big purchase. But the understanding and the explanation was that that was still going to, in the reality, after the new guards transaction happened, you can see this on pages 935 and 937 of the joint appendix, even after new guards was purchased, predominantly the revenues still were third-party revenues. And that was certainly still the third-party strategy was still the company's long-term plan, even with the new guards transaction. I think the company actually made clear in a couple different places that it was considering first-party acquisitions. They were kind of like this. In fact, in the offering materials themselves, the company identified Browns, the Browns purchase, which at that point, as the other side makes clear in its complaint, was representing somewhere, depending on how you count it, somewhere, you know, a significant portion of their overall profits was being generated from Browns. The offering materials identify Browns as an example of a possible acquisition that would be on the table. So they specifically sort of highlighted that. It was then an earnings call in February 2019 when the company's executives were talking about the role of the first-party retail in their overall strategy. And the statement was made that the first-party retail component was absolutely strategic, absolutely strategic. That's the phrase that was used. And it made clear that it was absolutely strategic because it was part of an overall strategy where making from time to time acquisitions in this space would generate a halo effect around certain products and would be used to drive consumers to go to the website and purchase from the platform. It was entirely consistent with the overarching third-party strategy to have a small but substantial first-party retail component to that. And when the opportunity came up to purchase Newgard, it was perfectly consistent with what the company had said in the offering materials when it reserved to itself the broad discretion, that's the phrase used in the offering materials, to make these kinds of acquisitions that were first-party, just like Browns, and that's what it did. I also think more, sorry. Sorry, I just, I want to come back to this February 2019 because you emphasized the statements in the offering and were saying that those predominated in the allegations. I think there were a number of allegations very much at the time when, the allegation anyway is that the Newgard due diligence was well underway. So in February 2019, they emphasize in response to a specific question about this, it's only 8% of the offer, it's in the single digits, which by the way was 20% at that time, counting the first-party platform, and long-term it will be single digits. That certainly suggests a trajectory away from the first-party realm at the very time when they're in due diligence on this acquisition. Well, I think respectfully, Your Honor, I think what the company was saying both in the offering materials and in that answer, which is the same answer where they say that first-party retail has an absolutely strategic role to play in our overarching strategy, is that look, we've got this big-picture strategy, mainly it's third-party, but there are going to be targeted ways in which, whether it's Browns or, as it turned out later, Newgards, where acquisitions may be made that are going to be complementary to that third-party strategy. Plaintiffs are saying that this was like a shift from the strategy, and they say on page 34 in the brief that the company had promised that all growth would be exclusively third-party, but that's just not true. That promise was never made, and that's, I think, the core of their argument here. Again, we cited Browns as an example of future potential acquisitions, and I think the general statements that you point to in that answer, coupled with the statements in that answer about why first-party is still absolutely strategic to the business, I think they lend context and explain why the company would consider acquisitions like Newgards. You know, that February statement was made, you know, a number of months before the Newgards transaction actually happened. It's true that due diligence started around that time, but nothing was definite yet, and it was perfectly within the company's, you know, the company was being very straightforward in sort of explaining its overarching strategy, the two components of it, and the balance. And I think one thing that's also important to make clear is that the company wasn't just saying words to talk about these strategies. The company was also putting down on paper real numbers to show the balance between first-party and third-party. I think the best example of this in the offering materials is the chart here on page 512 of the JA, where the company not only talked about the Browns sales, both the in-store sales and the online sales, but actually highlighted them in these red boxes so that investors would be able to see graphically and with the numbers, you know, what the proportion of sales would be. And then it went on to make similar statements talking about the balance of first-party and third-party in all of its securities filings throughout the class period. That's at pages 825, 840, and 1022 of the joint appendix. So I think throughout this period what you see is a strategy that's multifaceted. It's not just only third-party or only first-party. You see the company trying to be transparent about the overarching strategy, the company disclosing the exact balance of third-party and first-party within that strategy, and I think that on the whole they're being straightforward. There aren't any false. What about the statements? Sorry to interrupt, but in the roadshow and in interviews around the time, they were saying that the company would have no inventory and would be only a platform for retailers. No inventory, and then, you know, they spend three-quarters of a billion dollars buying a company with inventory. So I think a couple things on that. First of all, the roadshow statements are not part of the class period, so they're not part of the case. This is an important technical matter. I think with respect to the no inventory statement, I think that statement can't be understood in isolation, and it shouldn't be understood literally either, but those are two different points. It can't be understood in isolation because if you look at the full statement, the full statement is talking about FARFETCH's distributed inventory model, and then in the context of talking about that model, it says no inventory. The distributed inventory model is essentially the third-party portion of its strategy. I think that statement is best understood as really referring to the FARFETCH marketplace where it's, you know, the whole third-party strategy component of its overall operations. I don't think it was trying to say, and it would have been completely ridiculous, as we said in our brief, for the company to be saying that we don't have any inventory one day after they filed offering materials that highlighted in these big red boxes that there was all sorts of first-party sales that were going on. So it can't be taken in isolation. It can't be taken literally either. Well, now that you mention this, Mr. Martinez, I know that cases like this, of course, are generally or often decided on 12b-6, but your very different perspective on these matters in response to my colleague's questions raises a simple procedural question. Why aren't these issues properly subject to discovery or examination of relevant persons? It's always been a mystery to me how these financial cases are resolved on 12b-6, and I'm just wondering whether this is not—isn't this a case where everyone would benefit or the record would benefit from discovery and depositions of relevant persons? I don't think so, Your Honor. I think this is like a lot of the securities cases that you all see, and I think what this Court and what the Supreme Court and other courts have done is when assessing, for example, whether a statement is false, you've been willing to look at the allegations in the complaint, of course, but also to the materials that are referenced and incorporated in the complaint. Here that would be the documents such as, for example, the offering materials. But it does require the judge or the judges to make some kind of significant fact-finding decision in doing that. I don't think so, Your Honor. For example, I think the core claim here is being made that the company Farfetch was essentially hiding the first-party component of its strategy. But if you look at page 512 of the joint appendix and the other materials I've referenced, that allegation is just flatly incompatible with hiding anything because those revenues were fully disclosed. I think with respect to the allegation made on page 34 of their brief that we had somehow promised to the world that all acquisitions would be exclusively third-party, I think that assertion is just flatly belied by the record. Help me, since you've been good enough to give us very explicit citations to the record, which is always impressive but perhaps not overwhelming. Joint appendix, page 512. Let's turn to it, and perhaps you can just walk me through this. Why do you think the material at JA 512 is important for us to verify? Sure. I think this doesn't answer every aspect of the case because, of course, this was a 185-page complaint with a lot of things thrown at the wall, respectfully, in our view. I think this answers, I think, the primary thrust of the argument that we were hiding the first-party retail component of the strategy. And so if you look at the chart, because I think that's the most revealing portion of this, there are three different measures, GMV, revenue, and gross profit there. And if you look at the GMV and the revenue measures, they're the top two sort of horizontal bars on that chart. Sorry, and GMV is? GMV is the gross market place value. Yeah, sorry. A lot of different acronyms floating around in this case. Plus microscopic print, we're going to need something. Well, I think that's why the colors are so helpful, Your Honor. I'm not suggesting it's deliberate. No, I mean the colors are helpful here. So GMV, it's essentially the value of- We don't have the colors. We don't have the colors. We didn't give you the colors. Well, that's our fault, Your Honor. We'll happily submit this one page if it would be helpful. If you would. Yeah. And also magnified so that persons of advanced years can actually read the data provided under Group and Browns, et cetera. But it's all right. You'll do that. Yeah, we can do that. And I think just there, basically I'll just describe it to you. We have boxes that are colored. The red boxes that appear in the horizontal lines specifically break out and allow you to see graphically with the numbers attached to them, the absolute numbers and the percentage of revenues that are attributable to the first party. At that point, it was just Browns, the component. So I think someone who reads this would know that Browns was there. It says fulfillment and then first party. Yeah, fulfillment. The box to the right of fulfillment is the Browns sales that were on the platform. And in the box all the way to the right, which under the word Browns, those are the Browns in-store sales. So the Browns online is between fulfillment and third party. Exactly. And this will be a lot clearer with the colors. Sorry about that. I think you don't even need the colors, though, Your Honor, because the Browns component of the business is talked about. It's not hidden at all. It's talked about, I think, 70-plus times throughout the offering materials. I mean, this was not a secret that Browns was part of the business. And I think the most notable place in which Browns comes up in the offering materials, as relevant to this case, is in the portion where the company is talking about how they might use the proceeds of the IPO. And the company says, we're going to consider possible acquisitions. It says that these acquisitions might complement and expand the brand and products that we're going to offer. And then it says, you know, one example of a possible acquisition that we might consider is what we did with Browns, which at that point was generating a significant portion of the company's revenue. This is on 503. And it says create public market for Class A shares. And this includes possible acquisitions. But then it says we do not currently have any definitive or preliminary plans. Right. And they didn't have any definitive plans in mind. The New Guards allegation has been made, but at the time that these offering materials were issued, there's not an allegation that New Guards was under contemplation, even though they've talked to apparently an individual at the company who says he was on the New Guards acquisition when it ended up happening. Even that person doesn't seem to allege that New Guards was known at the time that the IPO was, you know, when these offering materials were put forward. Your Honor, if I could just say one last thing. I do think we've talked a lot about the falsity issues. We also don't think there's no scienter. I won't get into the details of that, but we think Judge Nathan got that exactly right as well. The issue that Judge Nathan did not reach in this case had to do with the Securities Act. We have several independent arguments on the Securities Act. I won't run through them, but I do want to flag, we do think there's a very substantial argument that there's no statutory standing under Section 11 because they haven't satisfied the traceability requirement, and under Section 12A2 because they haven't satisfied the immediate seller requirement. We think those are fully valid grounds that have been fully preserved and fully briefed for getting rid of the Securities Act. So those were presented to the district court, but she chose not to address them. Right, because we had other victorious arguments on falsity. Thank you. Thank you, Your Honor. Ms. Armsby, before you get into the specifics of your responses, what about this question of discovery? Can you give us an enlightenment on how a case like this evolves? Absolutely, Your Honor. First of all, with discovery, with new guards, we believe for at least four reasons, which the district court itself acknowledged that the new guards acquisition was very likely in play or at least in talks at the time of the acquisition. We don't have hard facts of that, but we know they were amping up their acquisitions team. We know that new guards was an existing customer. We know that new guards, that the acquisition of stadium goods started the day after the IPO. So frankly, any attempt for the defendants to say that the statement that there was no preliminary plans for acquisition is suspicious at best. But I think those are the kind of things discovery. But if I could turn, I think also, you know, my colleagues here say a lot that there's no reasonable investor could have ever believed that there was not going to be this type of new guards acquisition or growth. And if you look at the epitome of the reasonable investor, courts often look to analysts, and analysts certainly were stymied by these representations. At the beginning of the class period, they said there was great possibilities for Farfetch because they never take control of the product itself because Farfetch owns no inventory. These secondary commentators, though, aren't commenting on what is in the offering materials, are they? The preliminary prospectus was out at the time those statements were making. Yes, but they're responding to them. They're discussing what is the company's business model at a really fairly high level. I mean, these are brief accounts, not heavily analytical accounts, and they don't go through and look at what is actually presented in the offering materials, do they? I do believe that Luca Silca, who is one of the analysts for business and fashion, looked very intensely at this company from its start through the end, and other analysts from Forbes and analysts. And in August 2019, when the stock dropped 40- How do we know that from the record, what you're telling us? I think we allege that Luca Silca, among a couple of others, wrote many articles about the company from its inception, looked at how it compared to retailer YNAC, which was- Now, as we've-